IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAKIN ELLEGOOD and LINDSEY MYERS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:21-CV-303-WKW [WO] |
| GREYHOUND LINES, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Plaintiffs allege that Defendant Greyhound Lines, Inc., denied them "the enjoyment of all benefits . . . of the contractual relationship" for bus travel because of their race in violation of 42 U.S.C. § 1981 and breached their contracts in violation of state law.  In a prior Order, Defendant Greyhound Lines, Inc.'s motion for summary judgment (Doc. # 49) was denied without a memorandum opinion (Doc. # 65).  This memorandum opinion sets forth the reasons for the denial.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is proper over the federal-law claim under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights jurisdiction) and over the state-law claim under 28 U.S.C. § 1367 (supplemental jurisdiction). Personal jurisdiction and venue are not contested.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Alternatively, a movant without a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to

each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III. BACKGROUND

In April 2019, Plaintiffs Dakin Ellegood and Lindsey Myers were ticketed passengers traveling together by Greyhound bus from Panama City Beach, Florida, to Springfield, Illinois. Their one-and-a-half-year-old son accompanied them. (Doc. # 50-1 at 104–06.) Mr. Ellegood is a mixed-race male who by appearance is African American. (Doc. # 50-2 at 46; Doc. # 50-1 at 126.) Ms. Myers is a white female who was seven months pregnant at the time. (Doc. # 50-2 at 42, 50–51.)

This lawsuit is about what happened to Plaintiffs at the bus station in Montgomery, Alabama. Plaintiffs were scheduled to transfer to another bus in Montgomery for the next leg of their trip to Birmingham, Alabama. Mr. Ellegood and Ms. Myers entered the line together to board the bus with their toddler. Ms. Myers and the child boarded first. The bus driver told Ms. Myers that she had to sit at the back of the bus. When Ms. Myers questioned why, the bus driver responded

rudely that she did not want to listen to a crying baby.  Ms. Myers proceeded to the back of the bus and sat down.  (Doc. # 50-1 at 105–09; 50-2 at 42, 49.)

Mr. Ellegood heard the bus driver's instructions to Ms. Myers to sit at the back of bus.  (Doc. # 50-1 at 108–09.)  The bus driver, apparently unaware that Mr. Ellegood and Ms. Myers were traveling together, "smiled with a laugh" and said to Mr. Ellegood, "[T]hat's where I make all the white folks sit."  (Doc. # 50-1 at 122; *see also* Doc. # 50-1 at 112–13, 125.)  Mr. Ellegood then joined Ms. Myers at the back of the bus.  (Doc. # 50-2 at 43; Doc. # 50-1 at 120.)  Mr. Ellegood told Ms. Myers what the bus driver said to him.  (Doc. # 50-1 at 118–19.)  Offended by this statement, Ms. Myers wanted Mr. Ellegood to confront the bus driver so that she could "hav[e] [her] choice of where to sit."  (Doc. # 50-2 at 44, 48.)  So he did.

Plaintiffs' facts diverge at this point.  Ms. Myers testified that Mr. Ellegood, while seated at the back of the bus, raised his hand to get the bus driver's attention.  (Doc. # 50-2 at 49–50.)  The bus driver walked back to him, and Mr. Ellegood asked if they had to remain in the seats at the back of the bus.  (Doc. # 50-2 at 50.)  The bus driver said:  "I told her [Ms. Myers] she had come to the back because of the baby."  (Doc. # 50-2 at 50.)  Mr. Ellegood then said:  "Yes, but then you told me that this is where you seat all the white folks.  So I'm asking you, do we have to stay back here?"  (Doc. # 50-2 at 50.)  The bus driver responded, "Would you like to get off and wait for another bus?"  (Doc. # 50-2 at 50.)  At that point, either Mr. Ellegood

or Ms. Myers said: "No.  We're paying customers.  We're just asking you a simple question[;] are you forcing us to stay back here?"  (Doc. # 50-2 at 50.)

According to Mr. Ellegood, he was in his seat at the back of the bus, and the bus driver was at the front of the bus when he asked her if they had to stay at the back of the bus.  (Doc. # 50-1 at 124.)  Mr. Ellegood said he had to speak loudly because the bus driver was "an elderly lady" and might "have hearing problems" and that he remained in his seat because he did not want her to be fearful.  (Doc. # 50-1 at 127–29.)  In response, the bus driver told him that Ms. Myers had to sit at the back of the bus because of the baby.  Mr. Ellegood responded:  "You just told me that's where you make all the white folks sit."  (Doc. # 50-1 at 125.)  According to Mr. Ellegood, the bus driver asked them if they wanted to get off the bus.  Mr. Ellegood responded:  "I'm a paying customer, [and] I don't have to get off . . . the bus."  (Doc. # 50-1 at 126.)

After the statement that Plaintiffs were paying customers, Plaintiffs' account of what happened next merges:  The bus driver did not "say another word to [them]."  (Doc. # 50-2 at 50.)  The bus driver "just walked off the bus and got security."  (Doc. # 50-1 at 126.)  Greyhound security employees escorted Plaintiffs and their son from the bus.  (Doc. # 50-1 at 126–27.)

Ms. Myers pleaded with the bus driver to allow them to remain on the bus. The bus driver ignored her pleas.  (Doc. # 50-2 at 50–51, 53.)

Greyhound has submitted its written policies that prohibit discrimination "of any type" and that permit bus drivers to remove disorderly passengers from the bus. (Doc. # 50-3 at 2, 5; Doc. # 51.)   As to the latter, "[d]isorderly passengers or passengers exhibiting behaviors that may pose a danger to themselves or other passengers may be removed from the bus at the discretion of the driver." (Doc. # 50-3 at 5.) Greyhound contends that Plaintiffs' removal from the bus complied with its written policies because the bus driver believed that Mr. Ellegood's conduct was disorderly. (Doc. # 50 at 18–19; Doc. # 51 at ¶ 5.)

While Greyhound did not permit Plaintiffs to travel by bus from Montgomery to Birmingham, Greyhound arranged to transport Plaintiffs to the Birmingham bus station by a private hired vehicle. (Doc. # 50-1 at 79–83; Doc. # 50-2 at 59–60, 71.) During the ride to Birmingham, the driver ("Mike") told Plaintiffs that Greyhound employed him to take Greyhound's customers to their homes in Montgomery upon deboarding the bus. But he said this was the first time he had taken passengers from one bus stop to another bus stop and the first time he had provided transportation without advance payment. (Doc. # 50-1 at 83.)

Ms. Myers had safety concerns during the ride to Birmingham. She recalled that the private vehicle did not have any emblems (such as taxi, Uber, or Lyft), that she felt anxious in a private vehicle with a "random person," and that the experience caused her to have Braxton Hicks contractions.   (Doc. # 50-2 at 59–60, 79.)

Notwithstanding Ms. Myers's concerns, it is undisputed that Plaintiffs arrived safely and timely in Birmingham for their next bus ride and that they did not have to pay for the private hired vehicle to Birmingham.  (Doc. # 50-1 at 81–82; Doc. # 50-2 at 58, 71.)  In Birmingham, they boarded the next bus on time, and they reached their final destination of Springfield on time.  (Doc. # 50-1 at 82; Doc. # 50-2 at 71, 72.)

Plaintiffs proceed on two claims.  The first claim is brought under § 1981, alleging race discrimination in the contract for bus travel.  The second claim is brought under Alabama law for breach of contract.[1]  (Doc. # 1.)  Greyhound admits certain facts, including that Plaintiffs had bus tickets for travel from Panama City Beach, Florida, to Springfield, Illinois, that Greyhound ejected Plaintiffs from the bus in Montgomery, and that the bus driver was a Greyhound employee who was acting within the scope of her employment.  (Doc. # 13 at 1, 3, 6.)  Notwithstanding those admissions of fact, Greyhound denies any legal wrongdoing.

---

[1] In a prior Order (Doc. # 30), Defendant's motion for judgment on the pleadings was granted on Plaintiffs' state-law claim for intentional infliction of emotional distress and on the *respondeat superior* allegation to the extent the allegation represented an attempt to state an independent claim.

# IV.  DISCUSSION

## A.   42 U.S.C. § 1981 Claim

### 1.   *Defining Plaintiffs' § 1981 Claim*

To streamline the discussion, it is necessary first to define the contours of Plaintiffs' § 1981 claim.  In their Complaint, Plaintiffs allude to "a system of racial segregation on the bus."  (Doc. # 1 at 4.)  To the extent Plaintiffs allege that Greyhound has a systemwide policy that requires white passengers to sit at the back of the bus, Plaintiffs have presented no evidence to support that allegation.  Plaintiffs have not provided evidence of a policy requiring white passengers to sit at the back of Greyhound busses or otherwise requiring racially segregated seating.  There also is no evidence that any Greyhound bus displayed signage or other written manifestation of racially segregated, seat assignments on its line of busses or that Greyhound issued bus tickets with assigned seating.  (Doc. # 50-1 at 121.)

Greyhound, for its response, has submitted evidence of its written policy that "prohibit[s] discrimination and harassment of any type."  (Doc. # 50-3, at 2.)  Moreover, as to the bus on which Mr. Ellegood and Ms. Myers boarded in Montgomery, Mr. Ellegood admits that African-American and white passengers were seated in all areas of the bus and that both African-American and white passengers were seated at the back of the bus.  (Doc. # 50-1 at 108.)  To the extent

that Plaintiffs are alleging a systemwide policy of racially discriminatory seating of white passengers on Greyhound's busses, those allegations are not viable.

Instead, this case is about a Greyhound bus driver's requirement that Ms. Myers sit at the back of the bus.  Mr. Ellegood testified that the bus driver made a "targeted" decision to make "one white person in specific sit in the back of the bus." (Doc. # 50-1 at 121.)  The issues are whether the bus driver's requirement was because of Ms. Myers's race (white), and if so, whether Greyhound ejected Plaintiffs from the bus for part of their journey because they questioned the bus driver's directive that Ms. Myers sit at the back of the bus because she is white.  (*See* Doc. # 1 at 3; Doc. # 57 at 17–18.)

### 2.   *Section 1981: The Elements*

Section 1981 prohibits race discrimination in the making and enforcement of private contracts.  *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).  It commands that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." § 1981(a).  "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  § 1981(b).

To establish a § 1981 claim outside the employment context, a plaintiff must prove the following elements:  (1) that the plaintiff is a member of a protected class; (2) "that the defendant intended to discriminate on the basis of race"; and (3) "that the discrimination concerned one or more of the activities enumerated in the statute." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)).

Under the first element, § 1981 protections extend to all races.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 296 (1976) (Section 1981 "was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race."); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 n.6 (11th Cir. 2024) ("To tie up one loose end, we also reject any suggestion that § 1981 protects only members of minority groups." (citations omitted)).

Under the second element, a plaintiff may prove intentional race discrimination through direct evidence or circumstantial evidence.  *See Kinnon*, 490 F.3d at 891; *Afkhami v. Carnival Corp.*, 305 F. Supp. 2d 1308, 1320 (S.D. Fla. 2004). Where there is direct evidence of race discrimination, the burden shifts to the defendant to prove "by a preponderance of the evidence that the same decision would

have been reached even absent the presence of the discriminatory motive." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) (citation and internal quotation marks omitted). "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (per curiam) (cleaned up). Where there is direct evidence of discrimination, there is necessarily a genuine dispute of material fact as to discriminatory intent. *Horne v. Turner Const. Co.*, 136 F. App'x 289, 292 (11th Cir. 2005) ("Direct evidence of discrimination" is sufficient "to withstand a motion for summary judgment.").

Under the third element, § 1981 covers "all phases and incidents of the contractual relationship, including discriminatory contract termination." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994).

Unfortunately, the parties' arguments and analyses mostly address the § 1981 count as if it belongs to Plaintiffs jointly and do not adequately differentiate the facts between Ms. Myers's § 1981 claim and Mr. Ellegood's § 1981 claim. While some of the legal arguments apply to both Plaintiffs, the law must be applied separately to the facts of each Plaintiff's § 1981 claim. Because each Plaintiff's § 1981 claim

must stand on its own, each claim is addressed separately; however, where the legal theory is the same, the parties' references to Plaintiffs jointly are retained.

### (a)   *Ms. Myers*

Ms. Myers has established a genuine dispute of material fact on her § 1981 claim.  First, Ms. Myers is in a protected class, and Greyhound has not contended otherwise.  Section 1981 protects white individuals from discrimination.  *See Am. All. for Equal Rts.*, 103 F.4th at 777 n.6.

Second, contrary to Greyhound's assertion that this is a circumstantial evidence case, there is direct evidence of discrimination.  According to Mr. Ellegood's testimony, Greyhound's bus driver told him that Ms. Myers had to sit at the back of the bus because she is white.  The jury will have to decide which statement of the bus driver evidenced her intentions—the one to Mr. Ellegood that Ms. Myers had to sit at the back of the bus because she is white or the one to Ms. Myers that she had to sit at the back of the bus because she had a toddler who might cry.  Although Greyhound focuses on the bus driver's explanation to Ms. Myers that she had to sit at the back of the bus because of the baby, the intentions of the bus driver's competing statements cannot be weighed on summary judgment.  It is enough at this stage that one of the bus driver's statements—the one to Mr. Ellegood—is direct evidence that race discrimination motivated the bus driver's state of mind.  Additionally, Greyhound's arguments—that African-American and

white passengers were interspersed on the bus and that the logical interpretation of the bus driver's statement was that "she was simply making a joke" when she said white passengers had to sit at the back of bus—are for the jury.  (Doc. # 59 at 2.) The bus driver's statement is what drove this case to court.  Ms. Myers has created a genuine dispute of material fact as to the second element of her § 1981 claim.

The third element requires more discussion.  This element requires that the discrimination concern an activity enumerated in § 1981.  Greyhound argues that it did not deny Plaintiffs the ability to complete the contract because it transported them from their departure point to their arrival designation on schedule and safely. Plaintiffs counter that Greyhound denied them a safe and secure "contractual relationship of *bus transportation* from Montgomery to Birmingham, one leg of the trip . . . , based on race."  (Doc. # 57 at 10.)  They argue that Greyhound denied them the "full benefits" of their contractual relationship "by forcing them to travel with 'Mike,' . . . who was unknown to Plaintiffs, in his private vehicle, without any of the comfort, safety, security or space associated with a bus."  (Doc. # 57 at 11.)  Plaintiffs contend that "transportation by bus is the sole basis of the contract" (Doc. # 57 at 11) and therefore that transportation by any other mode does not fulfill the benefits of their contract.

The parties have not cited, and independent research has not uncovered, binding authority in the Eleventh Circuit applying § 1981 to claims brought by

passengers of commercial or public transportation.  Because of the dearth of on-point binding authority, Greyhound relies on two, non-binding § 1981 decisions decided in the retail-sales context and a non-binding § 1981 decision decided in the airline-transportation context.  (Doc. # 50 at 13–17.)

Cases addressing § 1981 claims in the retail-sales context are distinguishable. In the retail-sales context, "there is no continuing contractual relationship." *Kinnon*, 490 F.3d at 892 (quotation marks and citation omitted).  The relationship begins and ends with "a single discrete transaction" involving the sale of goods.  *Id.* (citation and internal quotation marks omitted).  To establish a § 1981 claim, the retail store must prevent, not merely deter, the plaintiff from making the purchase.  *See id.* (citation omitted).  Where the sale of goods is consummated, a § 1981 claim will not lie, notwithstanding that the plaintiff had to endure racial harassment during the contracting process.  *Id.*  The retail-sales cases cited by Greyhound are not well-suited for transportation cases.

Greyhound also relies upon *Parker v. Southwest Airlines Co.*, 406 F. Supp. 3d 1328 (M.D. Fla. 2019), but that case is not helpful.  There, the plaintiff completed her travel on the same flight she had booked.  To the contrary, here, Plaintiffs booked their travel by bus but were denied travel by bus for one leg of their trip. Additionally, the court's reasoning in *Parker* borrowed from cases decided in the retail-sales context.  *See id.* at 1336.

Transportation cases like this one find more commonality with restaurant dining cases than with retail transaction cases. "[D]ining at a restaurant generally involves a contractual relationship that continues over the course of the meal and entitles the customer to benefits in addition to the meal purchased." *Kinnon*, 490 F.3d at 893 n.5 (quoting *Arguello v. Conoco, Inc.*, 330 F.3d 355, 360 (5th Cir. 2003)). Extending *Kinnon*'s rationale to the transportation context, purchasing a ticket for bus travel involves a contractual relationship that continues over the course of travel and entitles the traveler to the benefits associated with the mode of transportation contractually promised.

Another decision—*Madison v. Courtney*, 365 F. Supp. 3d 768 (N.D. Tex. 2019)—is instructive for its persuasive value and involves a § 1981 claim predicated on air travel. In *Madison*, the plaintiff was the only African-American patron flying first class. The flight attendant did not offer to hang up the plaintiff's coat or serve him a drink, while the same offers were made to the white patrons who were flying first class. Also, after the plaintiff requested a beverage, he was served one that appeared to have mucus in it. *Id.* at 770, 773. The court found that the plaintiff "was

effectively denied the 'benefits of expanded service' and other concomitants of a first-class ticket." *Id.* at 771.

The court rejected the defendant's argument that the § 1981 claim must fail because the plaintiff "ultimately got everything he signed up for, even if it came by way of poor service." *Id.* at 772.  The court explained:

> The discrimination impaired Plaintiff's liberty to make, perform, modify, or terminate his contract with American, or to enjoy all the benefits, privileges, terms, and conditions of that contractual relationship. . . .  As [a first class passenger], he was entitled to the services that contractually accompany a first class ticket, including all standard first class amenities, such as coat and drink service.  When, as Plaintiff has alleged, [the flight attendant] refused to provide him with those amenities and even positively mistreated him, her discrimination prevented him from fully enjoying the benefits of this contractual relationship with American—even as the other, non-African American first class passengers fully enjoyed them.

*Id.*

Here, Ms. Myers had a bus ticket from Panama City Beach, Florida, to Springfield, Illinois.  Yet, Greyhound refused to provide Ms. Myers with transportation by bus for the full duration of her travels.  She was denied the benefit of bus travel from Montgomery to Birmingham, while other ticketed, African-American passengers received the benefit of bus travel.  By being denied bus travel, she did not have the same amenities that African-American passengers had, including a secure ride from a nationally recognized bus transportation company and immediate access to restrooms.  Other African-American passengers also did not

endure the embarrassment of being kicked off the bus.  The evidence, construed in the light most favorable to Ms. Myers, indicates that she was denied "the same right . . . to make and enforce contracts" as "enjoyed by [African-American] citizens." § 1981(a).

Greyhound has not disputed that Ms. Myers's bus ticket created a contractual relationship between Greyhound and Ms. Myers.  However, Greyhound argues that it did not deny her the enjoyment of the benefits of her contract by transporting her by a private hired car for one leg of the 830-mile trip.  Its arguments are not persuasive.

First, pointing out that approximately eighty-nine percent of Ms. Myers's trip was by bus, Greyhound argues that overall Ms. Myers received the benefit of her bargain:  "transportation *home*."  (Doc. # 50 at 18.)  However, the shortcoming in Greyhound's argument is the absence of evidence to support it. Greyhound has not provided evidence—through written documents or otherwise—memorializing the contractual terms governing alternate travel arrangements.  Neither the bus ticket— to the extent it contained the fine print of the terms and conditions of travel—nor other evidence of the stated contractual terms is in the summary judgment record.  If the contract contained terms permitting Greyhound to transport passengers by means other than bus, Greyhound has not submitted evidence to substantiate that.  It is

reasonable to infer, absent evidence to the contrary, that the purchase of a bus ticket means "transportation home" *by bus*.

Second, Greyhound points to Ms. Myers's testimony that she just wanted to get home and "didn't care how [she] got home," but her own personal desire is not a substitute for the contractual terms to which she and Greyhound agreed.  (Doc. # 59 at 7 (quoting Doc. # 50-2 at 74).)

Third, Greyhound argues that transportation by a private hired car for one leg of Ms. Myers's trip is at best, an unactionable inconvenience that cannot support a discrimination claim under § 1981.  Greyhound argues that, because Ms. Myers arrived at her final destination safely and on time, her § 1981 claim is not actionable. Inconveniences or poor treatment can be actionable in the transportation context, however, as *Madison* persuasively indicates.  *See* 365 F. Supp. 3d at 772.

Ms. Myers was denied the benefits of bus travel, which included on-board amenities, such as bathrooms (an important consideration for a mother who is seven months pregnant), companionship with other travelers, safety, and security.  Instead, unlike her fellow non-white, ticketed passengers, she had to travel in a hired private vehicle that had no markings of a transportation network company, and she testified that she felt less secure than had she traveled with a nationally recognized bus line.

Fourth, Greyhound posits that Plaintiffs were ejected from the bus because they were behaving disorderly, and not because of Ms. Myers's race.  However, as

to Ms. Myers, the parties do not point to any evidence or argue that she behaved in a manner that was disruptive or disorderly.  Instead, Greyhound argues that Mr. Ellegood, not Ms. Myers, "was loudly accosting" the bus driver.  (*See, e.g.*, Doc. # 50 at 20.)  Similarly, the statement provided by the bus driver during Greyhound's investigation of the incident focuses on the alleged misconduct of Mr. Ellegood.  (Doc. # 50-4.)

### (b) *Mr. Ellegood*

The analysis turns now to Mr. Ellegood's § 1981 claim.  As to the first element, Mr. Ellegood is in a class protected by § 1981.  As to the second element, the legal framework of Mr. Ellegood's § 1981 claim is not as clear.  Greyhound aptly points out that Mr. Ellegood has not testified that the bus driver targeted him when she said she "makes all the white folks sit" at the back of the bus.  (Doc. # 50-1 at 112–13.)  To the contrary, Mr. Ellegood testified that, in appearance, he is African American, that the bus driver "smiled with a laugh" in talking to him, and that the bus driver did not ask him to sit at the back of the bus.  (Doc. # 50-2 at 46; Doc. # 50-1 at 112–17, 126.)  In short, there is no evidence or argument that the bus driver asked or required Mr. Ellegood to sit at the back bus.  But those facts do not solidify or resolve the legal analysis on this record.

Turning to the second element, Mr. Ellegood's basis of discrimination under § 1981 *might* be (emphasis intentional) either that (1) Mr. Ellegood had to sit at the

back of the bus if he wanted to be with his family or (2) he was kicked off the bus because he protested Ms. Myers's having to sit at the back of the bus because she is white. (Doc. # 50-1 at 117.)  Greyhound (and Plaintiffs too) have lumped Ms. Myers and Mr. Ellegood together as "Plaintiffs" in discussing the legal elements and caselaw of a § 1981 claim.  (*See, e.g.*, Doc. # 50 at 13–22; Doc. # 57 at 15–16.)  The legal underpinnings of Mr. Ellegood's § 1981 claim have gone largely unaddressed. The lumping of the Plaintiffs' claims fails to sift the facts and apply the law to the facts of each Plaintiff's claim *individually* (emphasis intentional).  At summary judgment, the court declines to do the work of the parties and fill in the legal and factual gaps as to Mr. Ellegood's § 1981 claim.

Notwithstanding these legal and factual gaps, Greyhound argues that this is a circumstantial evidence case and that there is no liability under § 1981 because there is a non-discriminatory basis for requiring Mr. Ellegood to disembark the bus.  (Doc. # 50 at 20 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Namely, Greyhound argues that Mr. Ellegood "was loudly accosting" the bus driver and that Greyhound adhered to its policy by requiring a disorderly passenger to disembark the bus.  (Doc. # 50 at 20.)  However, the material facts are disputed on this issue.  The bus driver has provided a statement Mr. Ellegood "cursed" at her and "continued being very loud" after the bus driver asked him to exit the bus.  (Doc. # 50-4.)  However, there is evidence, construed in the light most favorable to Mr.

Ellegood, that he did not raise his voice in speaking with the bus driver (Doc. # 50-2 at 50) or that, alternatively, if he did speak loudly, it was because of the distance between him (who was at the back of the bus) and the bus driver (who was at the front of the bus).  (Doc. # 50-1 at 124, 127–29.)  The favorable construction of the evidence does not support Greyhound's argument that Mr. Ellegood "was loudly accosting" the bus driver, and the evidence creates a jury issue on the material facts. (Doc. # 50 at 20.)

As to the third element, which requires that the discrimination concern an activity enumerated in § 1981, Greyhound's arguments were addressed and rejected in the preceding section.  That discussion applies here also.

After careful consideration, the court has discretion, which it will exercise here, to permit Mr. Ellegood's § 1981 claim to go to trial.  *See Anderson*, 477 U.S. at 255 ("Neither do we suggest that the . . . trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").

## B.   **Breach-of-Contract Claim**

Because the case is going forward on Ms. Myers's and Mr. Ellegood's § 1981 claims, the breach-of-contract claim also will be carried with the case for purposes of a full factual development at trial before a jury.

## V.  CONCLUSION

Plaintiffs each bring a § 1981 claim alleging that, based on race, Greyhound discriminated against them by denying them "the enjoyment of all benefits . . . of the contractual relationship" for bus travel.  § 1981(b).  Plaintiffs also each bring a claim under Alabama law for breach of contract.  Summary judgment has been denied on these claims for the reasons set out in the Memorandum Opinion.

An Order setting a trial date will be entered separately.

DONE this 19th day of September, 2024.

_____/s/ W. Keith Watkins_____
UNITED STATES DISTRICT JUDGE